UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION



FILED
OCT 17 2018
U.S. CLERK'S OFFICE
INDIANAPOLIS, INDIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **18-cr-0333** RLY -DML |
| v. | ) | CAUSE NO. |
| | ) | |
| BRIAN FENNER, | ) | -01 |
| DENNIS BIRKLEY, and | ) | -02 |
| AMI ASSET MANAGEMENT INC., | ) | -03 |
| | ) | |
| Defendants. | ) | |

## INDICTMENT

The Grand Jury charges that:

## COUNT 1
### Title 18, United States Code, Section 1349
### (Conspiracy to Commit Mail, Wire, and Bank Fraud)

### Background

At times relevant to this Indictment:

1.    **BRIAN FENNER.** FENNER was a resident of the State of Indiana. He owned and operated two lots in Indianapolis, Indiana, which is in the Southern District of Indiana, where he towed and stored cars, trucks, boats, RVs, and other vehicles. FENNER was familiar with state and federal laws regarding vehicles, vehicle titles, repossession, the rights of auto lenders and vehicle owners, and mechanic's liens. FENNER also purported to own and operate several businesses at these two lots, through which he purported to offer a "service" of obtaining and disposing of vehicles from individuals around the United States who were planning to file bankruptcy, in exchange for paying those individuals' bankruptcy attorney's fees.

2.    **DENNIS BIRKLEY.**    BIRKLEY was a resident of the State of Wisconsin.    He and FENNER had known one another for many years.    BIRKLEY also owned and operated a lot, in Waukesha County, Wisconsin.

3.    **AMI Asset Management Inc. ("AMI").**    AMI was a company located at 807 Swan Drive, Mukwonago, Wisconsin 53149, owned and operated by BIRKLEY.    Person 1, a resident of Wisconsin, was an employee of AMI and served as BIRKLEY's assistant. Historically, AMI was a vehicle repossession company.    Accordingly, BIRKLEY, like FENNER, was familiar with state and federal laws regarding vehicles, vehicle titles, repossession, the rights of auto lenders and vehicle owners, and mechanic's liens.

4.    **Indiana Mechanic's Lien Law.**

a.    Indiana law states that a person who repairs, tows, and/or stores motor vehicles has a mechanic's lien on the vehicle for the "reasonable value" of the repair, towing, and/or storage costs.    Ind. Code ("IC") § 9-22-6-2(a)–(b).    If those costs are not paid, then the mechanic's lien holder can sell the vehicle "at public sale or public auction to the highest and best bidder" to recoup the costs and satisfy the mechanic's lien.    IC § 9-22-6-2(g)–(h).    Then, after recouping those costs and any expenses associated with advertising and selling the vehicle, the mechanic's lien holder "shall pay the surplus of the purchase price to the person that holds the first lien of record."    IC § 9-22-6-2(h).    The first lienholder, such as a financial institution, "may deduct and retain the amount of the lien of record from the surplus purchase price," and then "shall pay any remaining surplus to the owner of the vehicle."    IC § 9-22-6-2(i).

b.    There are procedures regarding notice and documentation that the mechanic's lien holder must follow to effect the public sale or auction of a vehicle.    If the

2

vehicle is not claimed within 30 days, the vehicle may be advertised for sale "in a newspaper . . . of general circulation in the city or town" where the mechanic's lien holder's place of business is located. IC § 9-22-6-2(c)–(d). The vehicle may not be sold until at least 15 days after the date of the advertisement. IC § 9-22-6-2(c). Additionally, the mechanic's lien holder must provide the purchaser of the vehicle with documentation concerning the sale, the vehicle identification number, certification that the vehicle was advertised for sale, and other information required by the Indiana Bureau of Motor Vehicles ("IN BMV"). IC § 9-22-6-2(j). The purchaser then provides those documents, and others, to the IN BMV to obtain clear title to the vehicle. IC § 9-22-6-2(j).

      c.      Finally, federal and Indiana law require that the seller of a motor vehicle disclose the current mileage of the vehicle to the purchaser. Title 49, United States Code, Section 32705; IC 9-17-2-6. The seller must fill out an "Odometer Disclosure Statement," which requires the seller to provide, among other things, their name and address, the vehicle's make, model, and VIN, the current mileage, and the seller's signature, which states that false statements may constitute the crime of perjury. The purchaser must also sign the form and submit it to the IN BMV to obtain the vehicle title. If a complete, valid form is not submitted, the title issued specifically states that the odometer has not been verified, which can decrease the value of the vehicle.

**The Charge**
**(Conspiracy to Commit Mail, Wire, and Bank Fraud)**

5.    Beginning in or before August 2013 and continuing through March 2016, within

the Southern District of Indiana and elsewhere, the Defendants

**BRIAN FENNER,**
**DENNIS BIRKLEY, and**
**AMI ASSET MANAGEMENT INC.,**

did knowingly and willfully combine, conspire, confederate and agree with themselves and others

known and unknown to the Grand Jury, to violate:

    a.    Title 18, United States Code, Section 1341 ("Mail Fraud"), that is, to

knowingly and with intent to defraud devise, and intend to devise, a scheme and artifice to

defraud, and to obtain money and property by means of materially false or fraudulent

pretenses, representations, and promises, knowing that they were false and fraudulent when

made, and knowingly cause to be delivered any matter or thing by mail or commercial

interstate carrier, according to the directions thereon, for the purpose of executing the

scheme, and for attempting to do so;

    b.    Title 18, United States Code, Section 1343 ("Wire Fraud"), that is, to

knowingly and with intent to defraud devise, and intend to devise, a scheme and artifice to

defraud, and to obtain money and property by means of materially false or fraudulent

pretenses, representations, and promises, knowing that they were false and fraudulent when

made, and transmit and cause to be transmitted certain wire communications in interstate

and foreign commerce, for the purpose of executing the scheme, and for attempting to do

so; and

    c.    Title 18, United States Code, Section 1344 ("Bank Fraud"), that is, to

knowingly execute, or attempt to execute, a scheme and artifice to defraud a financial

4

institution and to obtain monies, funds, credits, assets, securities, or other property owned by, or under the custody or control of the financial institution, by means of materially false and fraudulent pretenses, representations or promises.

## Purpose of the Conspiracy

6.    The purpose of the conspiracy was to obtain vehicles from financially distressed individuals, fraudulently clear the titles of those vehicles of liens from numerous financial institutions, as that term is defined in Title 18, United States Code, Section 20, banks, or other lienholders, and either keep the vehicles for themselves or sell the vehicles and keep the proceeds.

## Manner and Means of the Conspiracy

FENNER, BIRKLEY, and others known and unknown to the Grand Jury used the following manners and means, among others, to carry out the unlawful purpose of their conspiracy:

7.    FENNER, BIRKLEY, and others executed a scheme to defraud financial institutions, the IN BMV, and bankruptcy debtors and vehicle owners by, among other things, creating sham debts and holding sham auctions to satisfy those debts, in an effort to fraudulently exploit Indiana Mechanic's Lien Law to obtain clear title to motor vehicles.

8.    FENNER and BIRKLEY sought vehicles from debtors/vehicle owners around the United States who were planning to file for bankruptcy.  They targeted only vehicles that had been purchased with a loan, which were subject to a first lien from a financial institution or other lender.

9.    FENNER received the names and addresses of debtors/vehicle owners from a bankruptcy law firm in Chicago, Illinois and bankruptcy attorneys throughout the United States, who purportedly were or would be representing the debtors in their bankruptcies.

5

10.     FENNER and BIRKLEY, often through the attorneys, presented these debtors/vehicle owners with an offer:  FENNER would transport the debtor's vehicle from the debtor's residence, bankruptcy attorney's office, or other location, anywhere in the United States, to his lots in Indianapolis, Indiana, where the vehicle would be stored.  In exchange, FENNER would pay the debtors' attorneys' fees for the bankruptcy.  (In reality, BIRKLEY and Person 1 paid the attorneys' fees using either cashier's checks or checks bearing FENNER's company name and address, since, as part of the conspiracy, BIRKLEY and Person 1 had access to and control over the conspiracy's funds.)

11.     Between 2013 and 2016, numerous debtors from around the United States signed on with FENNER to transport and store their vehicles in exchange for what was viewed as a "free" bankruptcy.

12.     Before transporting a vehicle, FENNER, often with the assistance of the bankruptcy attorneys, had the vehicle owners sign documentation whereby they agreed to pay "fees" for the towing and storage of the vehicle, among several other charges.  The fees typically totaled between $2,000 and $4,000.  Many vehicle owners understood that they would not have to pay the fees, while others were unaware of the fees at all.

13.     After the vehicle arrived at FENNER's lots in Indianapolis, FENNER began taking steps to attach an Indiana mechanic's lien to the vehicle's title for the non-payment of the various "fees."  The amount of the lien equaled the amount of the unpaid fees.  As required by Indiana Mechanic's Lien Law, FENNER sent notices to the vehicle owner and first lienholder, usually a financial institution, stating that the vehicle was subject to a mechanic's lien.  The notice to the financial institution stated that, if the vehicle was not claimed, it would be sold at auction for the highest and best price.  Additionally, FENNER advertised the vehicle for sale at public auction

in a newspaper, albeit not a newspaper of general circulation where FENNER's business was located.

14.    The "fees" that were the subject of FENNER's mechanic's lien were artificially excessive for the purpose of executing the scheme.   They served both to discourage lienholders from claiming the vehicles, as well as to reap sufficient "profit" if the first lienholder (e.g., a financial institution) did successfully claim the vehicle.

15.    If the first lienholder did not claim the vehicle, however, FENNER's and BIRKLEY's scheme was designed to reap even greater profits.   They would purport to follow Indiana's Mechanic's Lien Law and claim to sell a vehicle at public auction.   This would, in theory, allow them to obtain the highest and best price for the vehicle, from which they could recoup their "fees" and then, under the Indiana's Mechanic's Lien Law, pay the surplus to the financial institution lienholder and possibly to the original vehicle owner too.

16.    But there were no auctions.   FENNER and BIRKLEY had already agreed that BIRKLEY and his company, AMI, would "win" the auctions and the vehicles would be transported to the AMI lot in Wisconsin.   Sometimes vehicles were transported to the AMI lot in Wisconsin even before the date that FENNER's purported auction was scheduled to take place.

17.    And, the auction "price" was already agreed to, often even before vehicles arrived on FENNER's lot from the debtors.   BIRKLEY and AMI, and others, would pay, or purport to pay, the exact amount of FENNER's mechanic's lien (which was equal to the amount of the excessive towing and storage fees).   Therefore, there was no "surplus," under Indiana Mechanic's Lien Law.   There was nothing left to pay to the financial institution lienholders or the original vehicle owners.

18.    BIRKLEY and Person 1 submitted the paperwork to the IN BMV, and BIRKLEY and AMI obtained a title to the vehicle in his or AMI's name free and clear of any liens.    That paperwork, however, was false.

19.    First, the notices to the lienholder and debtor and the advertisements regarding selling vehicles at public auction were false.

20.    Additionally, to ensure the vehicles retained their highest possible value, BIRKLEY and Person 1 altered some vehicles' odometer statements to represent to the IN BMV that the vehicle's odometer contained the vehicle's actual mileage.    Further, BIRKLEY and Person 1 signed the debtor's name on some odometer disclosure statements without the debtor's permission.

21.    After BIRKLEY received the clear title from the IN BMV, he typically sold the vehicles at a real public auction or to dealerships, or he advertised them for sale to the public. From these sales, the vehicles typically fetched significantly more money than BIRKLEY "paid" at FENNER's "auction."    The "profits" were split among FENNER and BIRKLEY.

22.    To keep track, BIRKLEY and Person 1 maintained packets of paperwork relating to each vehicle obtained through the scheme.    Often, each packet included a tally of the "profit" made from each vehicle, which was reflected by the amount BIRKLEY sold the vehicle for less the "costs" associated with obtaining the clean title, such as paying the bankruptcy attorneys' fees, paying to transport the vehicle to Indianapolis, and paying to transport the vehicle to Wisconsin. BIRKLEY did not include in this tally the cost for purchasing the vehicle at FENNER's sham auction.

## Wire Communications in Furtherance of the Conspiracy

23.    FENNER (in Indiana), BIRKLEY (in Wisconsin), Person 1 (in Wisconsin), and others in still other jurisdictions, utilized interstate wire communications in furtherance of the conspiracy's unlawful purpose.    For example:

a.    On or about December 28, 2014, FENNER and BIRKLEY exchanged emails in which FENNER expresses concerns that he is not being paid fairly, and in so doing, FENNER described the scheme and their roles:

> I brought this to you for us to be partners and make money.    Im not looking to be an employee and have done all you asked of me.    I do my job and put cars on the lot, deal with the banks and push them thro.    I want us to be fair and treat each other rite.    I think we have a good thing going here but im not happy with how things have gone this month . . . .we are partners here . . . . I don't like being treated as an employee, nor do I want to feel like you are only paying me what you think I should get.

b.    On or about January 28, 2015, BIRKLEY sent FENNER an email that listed the "profit" from three vehicles that they had obtained through the fraudulent scheme and sold.    FENNER replied, "All I need is 3k take the rest."

c.    On or about April 3, 2015, BIRKLEY sent FENNER an email that stated that he (BIRKLEY) needed "22,453.73 for expenses an[d] 9000 for pay advance" and that "we should get there very quickly if you get me title stuff."    The email then stated, "I closed out a lot of cars . from now on we will close out at the end of each month an[d] we should had a profit."

d.    On or about April 26, 2015, FENNER replied to BIRKLEY's April 3, 2015 email by stating "22,453.73 plus 9000.00 in advance" and then listing categories of vehicles that had been or were being obtained.    The first category contained five vehicles and was labeled, "you should be titling."    The next category contained six vehicles and

was labeled, "as of Monday auction 7-27-15, waiting on ti[t]le search and green [certified mail] cards but we own!"    The next category contained four vehicles and was labeled, "as of auction 4-27-15 sale date 5-10-15."    In this category, FENNER included notes about each of the vehicles, including two that are "bank noticed," one for which they "need to set up date for property appraisal," and one that says, "I'm going to try to push her out." FENNER's email closed by stating that "I need by Wednesday 4-29-15 3,500 for advance this month."

e.    On or about May 12, 2015, FENNER and BIRKLEY exchanged wire communications in interstate commerce, namely emails, regarding the transportation and storage fees that FENNER would charge.    FENNER stated, in part:

> We have to hold the vehicle so many days before we can perfect our lien by state law. We also need some time to generate a profit margin.    I would prefer not to send notice to the lien holder from the existing attorney up front.    This would eliminate our perfection of the lien as well as speed up the process and cutting our profit.

BIRKLEY replied, "We have to hold the car 30 day to generate storage."    His reply also included tally of the "fees" FENNER listed in the draft email and the potential expenses, $2000 for the bankruptcy attorney fees, which showed a net loss.    FENNER responded by proposing to add additional "fees," such as a $450 "file lien" fee, as well as a $175 "administration fee," and an $85 "key" fee.    BIRKLEY replied, "OK add lien fee," and then sent a separate email in which he described using higher prices for the various fees FENNER previously proposed, which resulted in "Total 4675, with will have 3000 in the car so profit is 1675."    BIRKLEY closed by asking, "What else can we charge for.    I was trying to get profit up to 2000.

f.      Additionally, on multiple occasions during the course of the scheme, including on or about August 11, 2015 and October 12, 2015, BIRKLEY, Person 1, and FENNER exchanged emails that attached a spreadsheet, which contained information about the vehicles they were obtaining from bankruptcy debtors and re-titling in BIRKLEY's name.  The spreadsheets included information about the debtor's name; vehicle information; date the vehicle was delivered to FENNER; the actual cost of towing the vehicle (which was substantially less than the "fees" that FENNER charged); the name of the law firm or lawyer handling the debtor's bankruptcy; the amount of the attorney's fees associated with the bankruptcy; the date of the check used to pay the bankruptcy fees; the date of the purported "auction," the date some of the vehicles were transported to Wisconsin prior to the "sham" auction, and the name of the bank which held a lien on the vehicle.

**Mailings and Shipments in Furtherance of the Conspiracy**

24.      FENNER, BIRKLEY, Person 1, and others utilized the mails and common carriers in furtherance of the conspiracy's unlawful purpose.   For example:

a.      On or about April 7, 2015, BIRKLEY sent in interstate commerce official check numbers 4000009388 and 4000009387 drawn on Pyramax Bank in the amounts of $2,500.00 and $2,865.00, respectively, remitter "Fenner and Associates," regarding debtor SM/JM involving a 2013 Utility Trailer, 2013 Utility F52C Trailer, 2007 Skeeter Boat, 2013 Dodge Ram, 2010 Peterbuilt Semi, and 2007 Freightliner Cl12 Semi to attorney SH and DH.

b.    On or about May 27, 2015, BIRKLEY sent in interstate commerce official check number 14000009486 drawn on Pyramax Bank in the amount $1,500.00, remitter "Fenner and Associates," regarding debtor JC involving a 2006 BMW X3 to attorney SH.

c.    On or about June 12, 2015, BIRKLEY sent in interstate commerce official check number 4000009534 and 4000009535 drawn on Pyramax Bank in the amounts $1,600.00 and $335.00, respectively, remitter "Fenner and Associates," regarding debtor TM involving a 2014 Nissan Juke to attorney UL.

d.    On or about June 12, 2015, BIRKLEY sent in interstate commerce official check numbers 4000009526 and 4000009527 drawn on Pyramax Bank in the amounts of $1,500.00 and $335.00, respectively, remitter "Fenner and Associates," regarding debtor RF involving a 2011 Chrysler 200 to attorney UL.

e.    On or about August 14, 2015, BIRKLEY sent in interstate commerce check numbers 1062 and 1067 in the amount of $2,000.00 each from FENNER's business checking account regarding debtor GL involving a 2015 Hartland Big Sky Camper and 2012 Ford F-150 to attorney WV.

f.    On or about August 12, 2015, Person 1 ordered four boxes of checks for FENNER's business account.   The checks were sent in interstate commerce to FENNER's business.   Person 1 instructed FENNER to "forward the checks up here once you receive them."

g.    On or about August 21, 2015, BIRKLEY sent in interstate commerce check numbers 1089 and 1088 in the amounts of $1,500.00 and $335.00, respectively, from FENNER's business checking account regarding debtor SD involving a 2015 Kia Soul to attorney KG.

h.    On or about August 21, 2015, BIRKLEY sent in interstate commerce check number 1110 in the amount of $3,235.00 from FENNER's business checking account regarding debtor MG involving three Ford F-250s, one Ford F-350, and a Ford Expedition to attorney UL.

i.    On or about August 21, 2015, BIRKLEY sent in interstate commerce check number 1093 in the amount of $2,000.00 from FENNER's business checking account regarding debtor LG involving a 2010 Honda Pilot to attorney BV.

j.    On or about November 18, 2015, BIRKLEY sent in interstate commerce check numbers 1487 and 1488 in the amounts of $2,049.00 and $335.00, respectively, from FENNER's business checking account regarding debtor MPR involving a 2013 Ford Explorer to attorney DLF/MD.

### Impact of the Conspiracy on Financial Institutions and Distressed Debtors

25.    In total, FENNER's and BIRKLEY's fraudulent scheme resulted in their taking possession of numerous vehicles owned by distressed debtors, fraudulently clearing the vehicles' titles of liens held by numerous financial institutions, and selling the vehicles at a profit to themselves.    As a result of the conspiracy, FENNER and BIRKLEY stole the financial institutions' collateral for their loans (the vehicles) and left the distressed debtors with no vehicles but still with the vehicle loan debt, which often could not be discharged in bankruptcy.

All of which is in violation of Title 18, United States Code, Section 1349, for conspiring to violate Title 18, United States Code, Sections 1341 (mail fraud), 1343 (wire fraud), and 1344 (bank fraud).

## **FORFEITURE**

26.     The allegations contained in paragraphs 1–25 of this Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Sections 982(a)(7) and (b)(1), 981(a)(1)(A) and (C), 1956(c)(7)(A) and (F), and 1961(1)(B) and pursuant to Title 28, United States Code, Section 2461(c), as part of any sentence imposed.

27.     Pursuant to Title 18, United States Code, Section 982(a)(7), if convicted of the offenses set forth in Count 1 of this Indictment, the Defendants,

> **BRIAN FENNER,**
> **DENNIS BIRKLEY, and**
> **AMI ASSET MANAGEMENT INC.,**

shall forfeit to the United States of America:

     a.     any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the offenses; or

     b.     a sum of money equal to the total amount of the proceeds of the offenses.

28.     If any of the property described in paragraph 27(a), as a result of any act or omission of the Defendants,

     a.     cannot be located upon the exercise of due diligence;

     b.     has been transferred or sold to, or deposited with, a third party;

     c.     has been placed beyond the jurisdiction of the court;

     d.     has been substantially diminished in value; or

     e.     has been commingled with other property which cannot be divided without difficulty,

then the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

29.    In addition, the United States may seek civil forfeiture of the property described in paragraph 27(a) pursuant to Title 18, United States Code, Sections 981(a)(1)(A) and (C), incorporating Title 18, United States Code, Section 1956(c)(7)(F), and pursuant to Title 28, United States Code, Section 2461(c).

A TRUE BILL:



FOREPERSON

JOSH J. MINKLER
United States Attorney

By:
Nicholas J. Linder
Assistant United States Attorney

15