UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

FILED
JAN 23 2020
U.S. CLERK'S OFFICE
INDIANAPOLIS, INDIANA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO. 1:18-cr-00333-RLY-DML |
| ) | |
| BRIAN FENNER, ) | -01 |
| DENNIS BIRKLEY, and ) | -02 |
| AMI ASSET MANAGEMENT INC., ) | -03 |
| ) | |
| Defendants. ) | |

## SUPERSEDING INDICTMENT

The Grand Jury charges that:

### BACKGROUND

At times relevant to all Counts of this Superseding Indictment:

#### Relevant Individuals and Entities

1. **BRIAN FENNER.** FENNER was a resident of the State of Indiana. He owned and operated tow lots and businesses in Indianapolis, Indiana, within the Southern District of Indiana, where he towed and stored cars, trucks, boats, RVs, and other vehicles. FENNER was familiar with state and federal laws regarding vehicles, vehicle titles, repossession, the rights of auto lenders and vehicle owners, and mechanic's liens.

2. **DENNIS BIRKLEY.** BIRKLEY was a resident of the State of Wisconsin and he owned and operated a tow lot and related business in Wisconsin. He and FENNER had known one another for many years. Like FENNER, BIRKLEY was familiar with state and federal laws regarding vehicles, vehicle titles, repossession, the rights of auto lenders and vehicle owners, and mechanic's liens.

3.  **AMI Asset Management Inc. ("AMI").**  AMI was a company located in Mukwonago, Wisconsin, owned and operated by BIRKLEY. Historically, AMI was a vehicle repossession company.

### Bankruptcy

4.  Filing bankruptcy allows financially distressed individuals an opportunity for relief from burdensome debts, including by adjusting payment plans or even eliminating, or "discharging," their debts. The bankruptcy process occurs in federal court, and individuals often seek assistance from an attorney when filing bankruptcy.

5.  When an individual's asset, such as a vehicle, served as collateral for a debt, such as an auto loan, the bank or lender had a "lien" or "first lien" on the asset, which, for vehicles, was often shown on the vehicle's title certificate. In bankruptcy, individuals often sought to discharge their auto loan debt in exchange for returning their vehicle to the bank or lender that had a lien on the vehicle.

### Indiana Mechanic's Lien Law

6.  Indiana law stated that a person who tows and stores motor vehicles had a "mechanic's lien" on the vehicle for the "reasonable value" of the towing and storage costs. Ind. Code ("IC") § 9-22-6-2(a)–(b). If those costs were not paid, then after certain requirements were met, the towing company who held the mechanic's lien could sell the vehicle "at public sale or public auction to the highest and best bidder" to recoup those costs and satisfy the mechanic's lien. IC § 9-22-6-2(g)–(h).

7.  After selling the vehicle, the towing company could keep the amount of its reasonable towing and storage costs, and any costs for advertising and auctioning the vehicle, and then "shall pay the surplus of the purchase price to the person that owns the vehicle." IC § 9-22-

6-2(h). If the person that owned the vehicle could not be located, the towing company was required to pay any surplus over to the county clerk's office "for the use and benefit of the person that owns the vehicle," such as by repaying the auto loan. IC § 9-22-6-2(h).

8. There were requirements for a towing company to advertise and sell a vehicle at auction to recoup its reasonable costs. The towing company was required to place an advertisement "in a newspaper that is printed in English and of general circulation in the city or town in which the lienholder's place of business is located." IC § 9-22-6-2(d). The advertisement must have described the vehicle, the amount of the unpaid costs, and the time, place, and date of the auction.

9. In addition, the towing company must "notify the person that owns the vehicle and any other person that holds a lien of record" by certified mail "that the vehicle will be sold at public action on a specified date to satisfy the mechanic's lien imposed by this section." IC § 9-22-6-2(f)

10. The vehicle may not be sold until at least 15 days after the date of the advertisement or the date that notice was sent to the vehicle owner and first lienholders, whichever was later. IC § 9-22-6-2(c).

11. When the vehicle was sold at auction, the towing company was required to provide the purchaser with documentation concerning the "facts of the sale," the vehicle identification number, the vehicle's title, and a certification of advertisement in the newspaper, among other information required by the Indiana Bureau of Motor Vehicles ("Indiana BMV"). IC § 9-22-6-2(i).

12. If the purchaser submitted the required documentation to the Indiana BMV, often referred to as "Application for Certificate of Title" documentation, then the purchaser may receive

a certificate of title to the vehicle free and clear of any liens, including any first liens from banks or other auto lenders. IC § 9-22-6-2(i).

### Vehicle Odometer Laws

13. Federal and Indiana law required a vehicle seller to disclose the current mileage of the vehicle to the purchaser, if available. Title 49, United States Code, Section 32705; IC 9-17-2-6. The seller was required to fill out and sign an "Odometer Disclosure Statement" under penalty of perjury. The purchaser must also sign and submit the form to the Indiana BMV to obtain title to the vehicle. If a complete and valid Odometer Disclosure Statement was not submitted, the purchaser's title would specifically state that the odometer did not reflect "actual mileage," which often decreased the vehicle's value.

### COUNT 1
### Conspiracy to Commit Mail Fraud and Wire Fraud
### (Title 18, United States Code, Section 1349)

14. Paragraphs 1 through 13 of this Superseding Indictment are incorporated by reference as though set forth fully herein.

15. From in or around at least August 2013, through in or around at least March 2016, within the Southern District of Indiana and elsewhere,

**BRIAN FENNER,**
**DENNIS BIRKLEY, and**
**AMI ASSET MANAGEMENT INC.,**

the defendants herein, did knowingly and willfully combine, conspire, confederate and agree with themselves and others known and unknown to the Grand Jury, to violate:

    a. Title 18, United States Code, Section 1341 ("Mail Fraud"), that is, to knowingly and with intent to defraud devise, and intend to devise, a scheme and artifice to defraud, and to obtain money and property by means of materially false or fraudulent

4

pretenses, representations, and promises, knowing that they were false and fraudulent when made, and knowingly cause to be delivered any matter or thing by mail or commercial interstate carrier, according to the directions thereon, for the purpose of executing the scheme, and for attempting to do so; and

    b.      Title 18, United States Code, Section 1343 ("Wire Fraud"), that is, to knowingly and with intent to defraud devise, and intend to devise, a scheme and artifice to defraud, and to obtain money and property by means of materially false or fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made, and transmit and cause to be transmitted certain wire communications in interstate and foreign commerce, for the purpose of executing the scheme, and for attempting to do so.

### Overview and Purpose of the Conspiracy and Scheme

16.      From in or around at least August 2013, through in or around at least March 2016, FENNER, BIRKLEY, and AMI and others known and unknown to the Grand Jury agreed to defraud and attempt to defraud banks and auto lenders, vehicle owners, and state motor vehicle titling agencies, including the Indiana BMV.

17.      The purpose of the conspiracy and scheme to defraud was to obtain possession of valuable motor vehicles from financially distressed individuals, remove liens from banks or other lenders from the vehicles' titles, and re-sell the vehicles at a profit to themselves (or keep the vehicles for themselves) without repaying the banks, lenders, or financially distressed individuals.

18.      As described below, FENNER, BIRKLEY, and AMI used and agreed to use a combination of methods to carry out their scheme, including but not limited to making and causing others to make false and misleading statements and omissions to state motor vehicle titling

agencies, including the Indiana BMV, the vehicle owners, and banks and other lenders with liens on the vehicles.

## Manner and Means of the Conspiracy and Scheme

### *The "Free Chapter 7 Bankruptcy Program"*

19. FENNER and BIRKLEY obtained vehicles from financially distressed individuals throughout the United States who were planning to file for bankruptcy by offering what FENNER marketed as the "Free Chapter 7 Bankruptcy Program," also known as the "Sperro Program." These individuals' vehicles typically had liens on them from banks or other lenders related to auto loans. As described above, in bankruptcy, individuals typically seek relief from their auto loans by returning their vehicles to the banks or other lenders who had liens on the vehicles.

20. Instead of returning vehicles to the banks or other lenders, some of which were located near where the financially distressed individuals lived, individuals who wanted a "free bankruptcy" agreed to have their vehicles towed from wherever they were located in the United States to FENNER's lots in Indianapolis, Indiana, without giving notice or obtaining consent from banks or other lenders with liens on the vehicles. In some cases, vehicles were towed to Indianapolis from as far away as California and Arizona. In exchange, the "Program" would pay the attorneys' fees associated with the individual's bankruptcy.

21. FENNER purported to run the "Program" and he marketed it to bankruptcy attorneys, often through email. Attorneys were typically paid between $1,000 and $1,500 for each vehicle towed to FENNER's lots. Some attorneys were occasionally paid bonuses when they recommended multiple clients to have their cars towed to FENNER's lots. In reality, as described herein, BIRKLEY and AMI paid the attorneys' fees with proceeds of the conspiracy but did so under FENNER's name so as to conceal BIRKLEY and AMI's role.

6

22. FENNER claimed to the bankruptcy attorneys that towing the vehicles to his lots benefitted not only the attorneys whose fees he paid, but also the financially distressed individuals, as well as the banks and other lenders who had liens on the vehicles by assisting banks and other lenders recover their collateral (the vehicle).

23. In reality, as set forth in this Superseding Indictment, the "Program" was the means by which FENNER and BIRKLEY would obtain high-value vehicles that they would later sell for significant profit to themselves without paying anything back to the financially distressed individuals, banks, or other auto lenders.

### *Claiming a "Mechanic's Lien" from Towing and Other "Fees"*

24. The defendants' scheme to defraud caused the Indiana BMV to issue titles for the vehicles free and clear of any liens from banks or other lenders by FENNER purporting to sell the vehicles to BIRKELY and AMI at "auction" to satisfy a "mechanic's lien." The purported mechanic's lien related to "fees" FENNER claimed to have charged the financially distressed individuals who participated in the "Program" to tow their vehicles from around the country to Indianapolis and store them on his lots.

25. The total amount of the fees FENNER purportedly charged was typically between $2,000 and $4,000 for each vehicle, which was significantly more than what BIRKLEY and FENNER paid to have the vehicle towed to FENNER's lot. FENNER and BIRKLEY communicated about ensuring that the purported fees were high enough to make them a "profit" if banks or other lenders came to claim the vehicle. They discussed ways to increase the total fee amounts, such as using higher prices for towing, adding new types of fees, and delaying sending the notices to the banks or other lenders with liens on the vehicles for a period of time to generate additional daily "storage" fees.

26. The financially distressed individuals understood, however, that they would not have to pay the fees, or they were unaware of the fees at all. Nevertheless, the defendants would later claim that the individuals' "debt" to FENNER gave him a "mechanic's lien" on the vehicle, which they used either to force the banks or other lenders to pay the "fees" to recover the vehicle, or more profitably for the defendants, to purport to "sell" the vehicle at "auction" to BIRKLEY and AMI, which would extinguish any first liens on the vehicle belonging to banks or other lenders and give the defendants free-and-clear title.

27. Shortly after a financially distressed individual agreed to have their car towed to FENNER's lot, the defendants began generating documentation to later submit to the Indiana BMV and other state motor vehicle titling agencies (collectively the "BMVs") to obtain a free-and-clear title. In so doing, the defendants took steps to conceal and further their conspiracy and its unlawful purpose. For example:

   a. The financially distressed individual was supposed to provide FENNER with a completed and signed Odometer Disclosure Statement, which attested that the vehicle's odometer was working and that the mileage on the odometer was correct. As described below, at times, AMI personnel completed and/or signed vehicle owner's names on Odometer Disclosure Statements to ensure that the odometer section of the new free-and-clear title did not state "not actual mileage."

   b. BIRKLEY and AMI typically conducted a title search on the vehicle using an online database to identify the name and address of any banks or other lenders who had liens on the vehicle. BIRKLEY and AMI sent a copy of the title search results to FENNER. As described below, when the title search results were later submitted to the BMVs, reference to AMI was often whited out.

8

   c. FENNER placed an advertisement in a newspaper, typically the "Hendricks County Flyer," a newspaper with limited circulation focused in Hendricks County, Indiana, even though the vehicles were located in Indianapolis, in Marion County. The advertisement claimed that the vehicle would be sold at a specific time, typically in the early morning hours such as 6:00 A.M., and at a specific place, sometimes at FENNER's personal residence. The advertised "price" equaled the amount that the defendants would later claim to the BMVs were reasonable "fees" for the towing and other services that the "Program" purported to charge the financial distressed individuals.

   d. FENNER generated letters to the vehicles' owners and/or the banks or other lenders who had liens on the vehicles, which purported to provide notice of FENNER's claimed mechanic's lien for the towing and other "fees" and that the vehicle would be sold at "auction" if not claimed. Many did not disclose the data and/or time of the purported auction. None disclosed that FENNER and BIRKLEY had agreed in advance that no "auction" would in fact occur and that the vehicle would be moved to AMI's lot in Wisconsin where BIRKLEY would claim that he and AMI "won" the purported auction for exactly the amount of the mechanic's lien.

***False Statements and Omissions to the Indiana BMV to Obtain Free-and-Clear Titles***

  28. In reality, there were no mechanic's lien auctions, or even sales. Unbeknownst to the BMVs, the vehicles' owners, and the banks and other lenders, FENNER and BIRKLEY had agreed in advance that most of the vehicles FENNER obtained through the "Free Chapter 7 Bankruptcy Program" would be moved to BIRKLEY and AMI in Wisconsin, so they could be sold through real auctions or other sales at their true market value (which was often significantly higher than the "purchase price" that BIRKLEY/AMI claimed to have "paid" FENNER for the vehicle in

the documents submitted to the BMVs), the proceeds from which BIRKLEY/AMI and FENNER would split.

29. To sell the vehicles for their true market value and retain the proceeds from those sales, the defendants needed to remove any liens from banks or other lenders on the vehicles' titles. As described above, under Indiana's Mechanic's Lien Law, the Indiana BMV would issue a title free and clear of any liens to the "highest and best bidder" for a vehicle at a mechanic's lien auction.

30. The defendants made materially false and misleading statements and omissions in Applications for Certificate of Title submitted to the Indiana BMV for vehicles obtained through the "Program" to receive free-and-clear vehicle titles and conceal that the purported "auctions" were not arms'-length transactions, or even transactions at all, by, among other things:

 a. Falsely representing that AMI purchased vehicles at FENNER's mechanic's lien auctions on a certain date for a certain "purchase price." In reality, there were no auctions and BIRKLEY and AMI did not pay any "purchase price" to FENNER.

 b. Falsely representing that FENNER sold vehicles to AMI and that AMI paid the purchase price in "cash." In reality, FENNER did not sell the vehicle and BIRKLEY/AMI did not pay for it. The vehicle was simply moved to AMI's lot in Wisconsin, occasionally before the date of the purported "auction," to be later sold at a price better reflecting the vehicle's true market value (or to be kept by BIRKLEY for personal use).

 c. Falsely representing that FENNER transferred full ownership of the vehicle to AMI, when in reality FENNER and BIRKLEY had agreed that FENNER would receive a share of the proceeds of BIRKLEY and AMI's later sale of the vehicle.

   d. Falsely representing that the towing and other "fees" were a debt due and owing by the vehicle's owner (the financially distressed individual), and that such "fees" were the reasonable value of towing and other services rendered.

   e. Falsely representing that vehicle owners had completed and signed Odometer Disclosure Statements, when in fact, on some statements, one of the defendants or other AMI personnel had completed the statement and/or signed the name of the vehicle owner.

   f. Often altering title search reports with white out to conceal the fact that BIRKLEY and AMI had run the title search on the vehicles before the vehicles were even advertised for sale.

31. As a result of the defendants' false and misleading statements and omissions, the Indiana BMV issued free-and-clear titles to BIRKLEY and AMI for vehicles obtained through the "Program." Furthermore, because the defendants claimed that the "purchase price" was exactly equal to the amount of the purported towing and other "fees," there was no "surplus" to be paid back to the vehicle owners or banks or other lenders. Therefore, through these false and misleading statements and omissions, BIRKLEY and AMI obtained free-and-clear titles to the vehicles, which were typically then sold for "profit," without having to repay the financially distressed individuals or banks or other lenders.

### *Other Acts of Concealment in Furtherance of the Conspiracy and Scheme*

32. In furtherance of their conspiracy and scheme to defraud, the defendants used methods in addition to those described above to conceal and perpetuate their conspiracy and its unlawful purpose, including:

11

      a.    The defendants removed, and caused to be removed, license plates from vehicles obtained through the "Program" to avoid AMI's license plate reading equipment and software from sending notifications to banks and other lenders who had liens on the vehicles that the vehicles were on AMI's lot in Wisconsin.

      b.    FENNER failed to return phone calls from vehicle owners and banks and other lenders regarding the status of the vehicles.

      c.    BIRKLEY and AMI personnel accessed and controlled bank accounts, one in the name of AMI at Bank 1 and the other in the name of "Fenner and Associates" at Bank 2, that they used to receive proceeds of the scheme and make payments in furtherance of the scheme. To conceal BIRKLEY and AMI's involvement when sending payments that recipients expected to be from FENNER's business, BIRKLEY and AMI personnel typically either used bank checks from the AMI account endorsed as though they were from FENNER's business, or moved funds from the AMI account to the "Fenner and Associates" account (examples of which are the financial transactions listed in Counts 15–17 below) and then wrote checks from the "Fenner and Associates" account, which were signed with a stamp of FENNER's signature.

      d.    At the same time, when submitting sales tax payments to the Indiana BMV, which were expected to be from the purchaser of a vehicle, BIRKLEY and AMI sent payment from the account in AMI's name, not "Fenner and Associates."

      e.    FENNER and BIRKLEY made false and misleading statements and omissions regarding, among other things, the nature of their relationship and the purported "auctions," in testimony under oath related to lawsuits against them filed by lenders who had first liens on the vehicles, including in:

   i. Deposition of Dennis Birkley, *Ford Motor Credit Company LLC v. Sperro LLC et al.*, Case No. 49D06-1512-PL-40415, Marion County, Indiana, Dec. 17, 2015.

   ii. Deposition of Brian Fenner, *Ford Motor Credit Company LLC v. Sperro LLC et al.*, Case No. 49D06-1512-PL-40415, Marion County, Indiana, Dec. 18, 2015.

   iii. Hearing Testimony of Dennis Birkley and Brian Fenner, *Ford Motor Credit Company LLC v. Sperro LLC et al.*, Case No. 49D06-1512-PL-40415, Marion County, Indiana, Dec. 22, 2015.

### *Selling the Vehicles and Splitting the "Profits"*

33. After BIRKLEY and AMI obtained free-and-clear title for the vehicles from the BMVs, the vehicles were often sold at real auto auctions or through other true third-party sales. The amounts received typically better reflected the vehicle's true market value and exceeded the "price" that BIRKLEY and AMI claimed to have paid to FENNER at the mechanic's lien auction.

34. The defendants maintained ledgers and spreadsheets for what they termed as their "company." The ledgers and spreadsheets calculated their "profit" on each vehicle, showing the amounts received from the sales of the vehicles and the "costs" associated with obtaining the vehicle and obtaining a free-and-clear title from the BMVs. The "costs" on the ledgers did not include any amount for BIRKLEY and AMI's purported "purchase price" of the vehicles at FENNER's "auction."

35. BIRKLEY and AMI sent payment to FENNER related to FENNER's share of the "profits" of their "company."

36.     As a result of the scheme, the defendants obtained or attempted to obtain free-and-clear titles to at least 100 vehicles. For the vehicles BIRKLEY and AMI later sold, they received a total of over $650,000.00. On at least one occasion, BIRKLEY and AMI did not sell the vehicle for which they obtained free-and-clear title, but instead, BIRKLEY kept the vehicle for his personal use.

### *Use of the Mails and Interstate Wire Communications*

37.     In furtherance of the conspiracy and scheme, the defendants made and caused to be made the use of the mails or common carriers, and interstate wire communications, examples of which are listed in Counts 2–14 below.

All of which is a violation of Title 18, United States Code, Section 1349.

### COUNTS 2–14
### Mail and Wire Fraud
### (Title 18, United States Code, Sections 1341, 1343, and 2)

38.     Paragraphs 1 through 13 and 16 through 37 of this Superseding Indictment are incorporated by reference as though set forth fully herein.

39.     From in or around at least August 2013, through in or around at least March 2016, within the Southern District of Indiana and elsewhere,

**BRIAN FENNER,
DENNIS BIRKLEY, and
AMI ASSET MANAGEMENT INC.,**

the defendants herein, together with others known and unknown to the Grand Jury, did knowingly and with intent to defraud, devise a scheme and artifice to defraud, and attempt to do so, and to obtain money and property by means of materially false and fraudulent pretenses, representations,

14

and promises, knowing that such pretenses, representations, and promises were false and fraudulent when made.

*Purpose*

40. The Grand Jury realleges and incorporates by reference paragraphs 16 through 18 of this Superseding Indictment as a description of the purpose of the scheme and artifice.

*Manner and Means*

41. The Grand Jury realleges and incorporates by reference paragraphs 19 through 37 of this Superseding Indictment as a description of the manner and means of the scheme and artifice.

*Use of the Mails and Interstate Wire Communications*

42. On or about the dates specified as to each separate count below, for the purpose of executing the aforesaid scheme and artifice to defraud, and attempting to do so, the defendants did knowingly cause to be delivered any matter or thing by mail or commercial interstate carrier, according to the directions thereon ("Mail Fraud"), and did knowingly transmit and cause to be transmitted certain wire communications in interstate and foreign commerce ("Wire Fraud"), as more particularly described below:

| Count | Charge | Approximate Date | Description |
|---|---|---|---|
| 2 | Wire Fraud | February 4, 2015 | Email from BIRKLEY to FENNER regarding BIRKLEY creating "Sperro LLC" for FENNER |
| 3 | Wire Fraud | April 3, 2015 | Email, with attached ledgers, from BIRKLEY to FENNER regarding revenue, expenses, and "profit" for vehicle sales |

| Count | Charge | Approximate Date | Description |
|---|---|---|---|
| 4 | Mail Fraud | April 7, 2015 | Parcel containing bank check, remitter "Fenner and Associates," sent from BIRKLEY and AMI in Wisconsin to bankruptcy attorney SH in Oklahoma relating to multiple vehicles including 2013 Dodge Ram truck, 2013 Utility FS2 Trailer, 2013 Utility Stepdeck Trailer, 2007 Freightliner Cl12 Semi Truck, and 2007 Skeeter Boat |
| 5 | Wire Fraud | April 26, 2015 | Email from FENNER to BIRKLEY regarding finances and the status of vehicles that had been or were being obtained, including vehicles BIRKLEY "should be titling" and vehicles "we own" |
| 6 | Wire Fraud | May 19, 2015 | Email from FENNER to BIRKLEY regarding status of vehicles that had been or were being obtained and "paperwork" for each |
| 7 | Mail Fraud | June 12, 2015 | Parcel containing bank check, remitter "Fenner and Associates," sent from BIRKLEY and AMI in Wisconsin to bankruptcy attorney in Illinois relating to 2014 Nissan Juke |
| 8 | Wire Fraud | July 2, 2015 | Email, with attached ledgers, from BIRKLEY to FENNER regarding revenue, expenses, and "profit" for vehicle sales |
| 9 | Mail Fraud | July 5, 2015 | Parcel containing Application for Certificate of Title sent from BIRKLEY and AMI Wisconsin to the Indiana BMV relating to 2011 Chrysler 200 Touring |
| 10 | Mail Fraud | July 15, 2015 | Parcel containing Application for Certificate of Title sent from BIRKLEY and AMI in Wisconsin to the Indiana BMV relating to 2012 Ford Fusion |
| 11 | Wire Fraud | August 11, 2015 | Email, with attached ledgers, from BIRKLEY to FENNER regarding vehicles, bankruptcy attorneys, and financial matters |
| 12 | Mail Fraud | September 15, 2015 | Parcel containing Application for Certificate of Title sent from BIRKLEY and AMI in Wisconsin to the Indiana BMV relating to 2015 Heartland "Big Sky" camper |

| Count | Charge | Approximate Date | Description |
|---|---|---|---|
| 13 | Mail Fraud | September 24, 2015 | Parcel containing Applications for Certificate of Title sent from BIRKLEY and AMI in Wisconsin to the Indiana BMV relating to two 2011 Ford F250 trucks and one 2012 Ford F250 truck |
| 14 | Wire Fraud | January 26, 2016 | Email from BIRKLEY to FENNER attaching title search results and stating "Hey white out the ami on the other searches please" |

Each of Counts 4, 7, 9, 10, 12, and 13 is a separate violation of Title 18, United States Code, Sections 1341 and 2 (Mail Fraud).

Each of Counts 2, 3, 5, 6, 8, 11, and 14 is a separate violation of Title 18, United States Code, Sections 1343 and 2 (Wire Fraud).

## COUNTS 15–17
## Money Laundering
(Title 18, United States Code, Sections 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), and 2)

43. Paragraphs 1 through 13 and 16 through 37 and 40 through 42 of this Superseding Indictment are incorporated by reference as though set forth fully herein.

44. On the dates specified below, within the Southern District of Indiana and elsewhere,

**BRIAN FENNER,
DENNIS BIRKLEY, and
AMI ASSET MANAGEMENT INC.,**

the defendants herein, together with others known and unknown to the Grand Jury, did knowingly conduct and attempt to conduct a financial transaction affecting interstate commerce, as described in each of the enumerated Counts below, which involved the proceeds of a specified unlawful activity – namely, Mail Fraud and Wire Fraud, in violation of Title 18, United States Code, Sections 1341 and 1343, respectively – with the intent to promote the carrying on of the specified

17

unlawful activity and knowing that the transaction was designed, in whole or in part, to conceal and disguise the nature, location, source, ownership and control of the proceeds of specified unlawful activity.

| Count | Approximate Date | Financial Transaction |
|---|---|---|
| 15 | August 3, 2015 | Deposit of bank check for $46,950.00 withdrawn from AMI bank account at Bank 1 ending in -33100 into Fenner & Associates LLC bank account at Bank 2 ending in -8296 |
| 16 | August 5, 2015 | Deposit of bank check for $10,000.00 withdrawn from AMI bank account at Bank 1 ending in -33100 into Fenner & Associates LLC bank account at Bank 2 ending in -8296 |
| 17 | October 26, 2015 | Deposit of bank check for $51,721.00 withdrawn from AMI bank account at Bank 1 ending in -33100 into Fenner & Associates LLC bank account at Bank 2 ending in -8296 |

Each of Counts 15–17 is a separate violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i), 1956(a)(1)(B)(i), and 2.

## FORFEITURE

45. The allegations contained in paragraphs 1–44 of this Superseding Indictment are hereby re-alleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Sections 982(a)(7) and (b)(1), 981(a)(1)(A) and (C), 1956(c)(7)(A) and (F), and 1961(1)(B) and pursuant to Title 28, United States Code, Section 2461(c), as part of any sentence imposed.

46. Pursuant to Title 18, United States Code, Section 982(a)(7), if convicted of the offenses set forth in Counts 1–17 of this Superseding Indictment, the Defendants,

**BRIAN FENNER,
DENNIS BIRKLEY, and
AMI ASSET MANAGEMENT INC.,**

shall forfeit to the United States of America:

    a.    any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the offenses; or

    b.    a sum of money equal to the total amount of the proceeds of the offenses.

47. If any of the property described above, as a result of any act or omission of the Defendants,

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be divided without difficulty,

then the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

48. In addition, the United States may seek civil forfeiture of the property described above pursuant to Title 18, United States Code, Sections 981(a)(1)(A) and (C), incorporating Title 18, United States Code, Section 1956(c)(7)(F), and pursuant to Title 28, United States Code, Section 2461(c).

A TRUE BILL:



FOREPERSON

JOSH J. MINKLER
United States Attorney

By: _____
Nicholas J. Linder
Bradley P. Shepard
Assistant United States Attorneys